## Herman Wise v. Yazoo City.

### [51 South. 453.]

1. Municipalities. *Powers.*

Municipalities have no powers other than those granted by the legislature either expressly or by necessary implication.

2. Same. *Eminent domain.*

While a statute investing a municipality with the power of eminent domain should not be so strictly construed as to defeat the evident purpose of the legislature, it must be limited to the purposes specified therein.

3. Same. *Same. Special charter.*

The special charter of Yazoo City (Laws 1884, p. 566, amended by executive proclamation January 15, 1906, under Code 1892, § 3039, Laws 1900, p. 79) authorizing the acquisition by the municipality of property for streets, waterworks, electric light lines, gas mains, street railways, places of quarantine, and buildings required for quarantine, *or any other purpose*, does not confer on the city the power to condemn land for a spur track from a railroad to its power house so as to reduce the expense of carriage of fuel for the generation of power for its waterworks, electric light, sewerage and street railway system, since the words *"or any other purpose"* are referable to the powers specifically conferred.

From the chancery court of Yazoo county.

, Hon. G. Garland Lyell, Chancellor.

Wise, appellant, was complainant in the court below; Yazoo

City, appellee, was defendant there. From a decree in defend-
ant's favor the complainant appealed to the supreme court.

Yazoo City, appellee, initiated statutory proceedings to con-
demn lands for the purpose shown in the opinion of the court;
Wise, appellant, enjoined the proceedings, instituting this suit
in equity for that purpose. The facts are fully stated in the
opinion of the court and section 20 of the city's special charter,
the construction of which was involved, is quoted therein.

*Campbell & Campbell,* for appellant.

The city claims authority to condemn the land involved in
this suit by virtue of section 20 of its charter as amended.

The object and purpose of condemning the land in question
is to construct thereon a railroad to be used for conveying, prin-
cipally, coal to the city's power house, from the tracks of the
Yazoo & Mississippi Valley Railroad Company. If the city
has power to condemn land for the purpose of constructing a
railroad it must derive the power from section 20 above cited.
and the authority must be either expressed or conferred by
necessary implication. *Waterbury v. Platt,* 75 Conn. 387, 53
Atl. 958, 60 L. R. A. 211; *Markham v. Howell,* 33 Ga. 508;
*Providence, etc., R. Co. v. Norwich, etc., R. Co.,* 124 Mass. 277;
*Tacoma v. State,* 4 Wash. 64, 29 Pac. 847.

Our contention and argument is that the act does not confer
the authority on the city either in express or implied terms. A
reading of the act fails to disclose any express authority to
build or operate a railroad. The act first confers upon the
council power to condemn private property for streets, roads,
alleys, hospitals, burying grounds, landings, wharves, sewerage,
waterworks, electric light lines, gas mains, street railways, and
places of quarantine. And then if the council should not deem
it necessary to acquire the fee in the private property taken for
the above purposes, but should conclude that an easement, user
or right of way would meet the exigencies of the case it pro-

ceeds to confer upon the council the power to condemn an ease-
ment, user, or right of way in, under or over any private prop-
erty for the laying of water, sewerage or gas mains or pipes, or
any of the purposes above mentioned. Now let us refer to
each of the purposes above mentioned and endeavor to line one
of those "purposes" with the words, easement, user, or right of
way and obtain for the city the right to condemn a right of way
for a railroad or spur track. The combination cannot be found
—but the counsel for the city contend that the combination,
"an easement, user, or right of way for a waterworks" gives
the desideratum. Ask ten men what "an easement, user or
right of way for a waterworks" conveys to their minds, and we
venture the assertion all would reply, in substance, a site or
place for the building, pumps, wells, reservoir, and water pipes
or mains connected with a waterworks; and it would not occur
to any one of them that a "right of way" for a railroad was
even contemplated.

It is very clear that section 20 does not in express terms
authorize the city to condemn the land involved in this suit,
however strained the construction. Then does the city get
the authority to condemn this land by necessary implication?

Before discussing the facts from which we must determine
whether the particular act now under consideration confers an
implied power to condemn, we wish to call to the court's atten-
tion, the rule that all acts conferring the power of eminent do-
main must be strictly construed.

"The power of eminent domain being in derogation of the
common right, acts conferring it are to be strictly construed
and are not to be extended beyond their plain provisions. The
right to exercise the power is strictly limited to the purposes
specified in the statute conferring it. The proposed use of the
land of the owner must be clearly embraced within the legiti-
mate object of the power conferred. Where there is any doubt
in regard to the extent of the power the land owner must have

the benefit of that doubt." 15 Cyc. 567, 568; *Harvey v. Aurora, etc., R. Co.,* 174 Ill. 295, 51 N. E. 163; *Goddard v. Chicago, etc., R. Co.,* 104 Ill. App. 526, 66 N. E. 1066; *Minn. Canal & P. Co. v. Koochicking Co.,* 107 N. W. 405, 5 L. R. A. (N. S.) 638; *Erie R. Co. v. Steward,* 63 N. E. 118; *Painters v. St. Clair,* 34 S. E. 989; *State v. Superior Court,* 78 Pac. 1011; *City of Waterbury v. Platt Brothers Co.,* 53 Atl. 958, 60 L. R. A. 211; *Georgia R. & B. Co. v. Mayor, etc., Union Pt.,* 47 S. E. 183; *Dewey v. Chicago, etc., R. Co.,* 56 N. E. 804; *Claremint R. Co. v. Putney,* 62 Atl. 729; *Gaines v. Lunsford,* 47 S. E. 967; *City of Detroit v. Doley,* 37 N. W. 11; *Glover v. Boston,* 14 Gray, 282; *Wilson v. Lynn,* 119 Mass. 174.

By referring to the petition for condemnation filed by the city we find that it is engaged in the business of operating a light, water and sewerage system and line of street railway— that it owns a power house which is situated on the bank of the Yazoo River, a navigable stream. about one thousand four hundred feet from the main line of the Yazoo & Mississippi River Valley Railroad Company—that the Producers Cotton Oil Company has constructed a spur track from its property to the main tracks of the Yazoo & Mississippi Valley Railroad Company and the city secured the right to use this spur track; that the city desires to connect its power house with this spur track for the purpose of conveying coal to its said power house from the main line of the Yazoo & Mississippi Valley Railroad Company; that it is necessary that the city have coal in order to operate its plant; that the land of complainant lies between the terminal of said spur track and the power house and it is necessary to lay a track on complainant's land in order to connect the spur with the power house. We find that said power house is located on a public street and the city can convey coal from the freight yards of the Yazoo & Mississippi Valley Railroad Company to its power house on said street at a cost of twenty-five cents per ton more than if it used the spur tract; and can also with some hazard

get coal by the Yazoo River which is superior in quality to the coal received by rail, but more expensive; however its superior heating qualities offset this additional cost.

We have seen that section 20 does not give the city express authority to condemn for the purpose here sought. Now in view of these facts, has the city that right by virtue of implication? We say it clearly has not.

What is meant by necessary implication? And when should this method of construction be resorted to? Our answer is that certain powers not expressed in the grant are to be implied when not to do so would defeat the accomplishment of the purpose and object of the grant. For instance: suppose a corporation is granted the power under its charter to own and operate a railroad and given power to condemn land for this purpose. Here nothing is said about side tracks, depots, turn tables, repair shops; yet to deny the corporation the right to condemn land for these purposes would render the railroad inoperative and thereby defeat the purpose of the grant.

We now ask that the test be applied and inquire, Is it necessary and indispensable to the construction, operation or maintenance of the city's electric, light, water and sewerage plant that it condemn the spur track in question? Will the object and purpose of section 20 be destroyed if the spur track is not built? The facts in this case refute any such idea. The purpose of the spur track is not to supply the city with coal because it cannot get it without the spur, but to supply it with coal at a reduction of twenty-five cents per ton, over the cost of getting it by other means. Never for a moment must we conclude that to deny the city the right to condemn this land will cause the city to suspend the operation of its plant, nor even impair the operation of it. Admit that it can operate less expensively with the spur track than without it, this additional expense is a small item to a business that shows a net earning up to February 23, 1909, of nearly $70,000 and a net earning

for the preceding year of about $8,000. If the city's power plant was so situated that it had no means of ingress whereby it could get coal, possibly it would have the right, by necessary implication, to condemn for a right of way on which to construct a spur track in order to secure coal which is necessary for the operation of the plant. But in this case the city admits that it can secure the coal by other means, one of which only costs twenty-five cents per ton additional. This means of access which the city seeks to condemn is not indispensable to the operation of the plant, but only conducive to a less expensive operation of it. We earnestly insist that the inevitable conclusion must be that the city by said section 20 has neither the express or implied power to condemn the land of complainant for the purpose of erecting thereon a railroad or spur track, to be used by the city for conveying coal to its power house.

*Holmes & Holmes,* for appellee.

The appellee is a municipal corporation with a special charter, under which it owns and operates a waterworks, electric light, sewerage, and street railway system, serving alike the general public without discrimination. This entire system is operated from the city's single plant or power house which is located on the Yazoo River within the corporate limits. The operation of every branch of this system is absolutely dependent for its very existence upon the use by appellee at its power house of enormous quantities of coal, agreed to be about four thousand five hundred tons a year.

It further appears that the only feasible way of obtaining coal for this purpose is by rail; that the coal obtained by river is not only more expensive but can only be secured at great hazard. In addition to the hazard, it is only possible to get river coal at one or two periods of the year when the water is high. This last fact, in view of the immense quantities used by the city would compel the appellee, if it had to rely on the

river, to procure and store at one time all the coal it would need for an entire year in advance, in which event, of course, it would need land adjoining its power house on which to store the same.    It is agreed that the other industrial plants located on the Yazoo river near appellee's power house, such as the Mississippi Cotton Oil Company and the Producers Cotton Oil Company do not rely upon the river for coal but obtain practically all their coal by rail.

To the end, then, that the city might bring this admittedly necessary and indispensable article to its furnaces in the safest, quickest, cheapest and, we submit, only reasonably practical way, it desired a spur track from its power house to the tracks of the Yazoo & Mississippi Valley Railroad Company which spur would traverse one corner of a vacant lot of the appellant for a distance of one hundred and twenty-five feet in length and for twenty-five feet in width.    Being unable to agree with Wise upon a reasonable price for this land, the appellant sought to acquire a right of way over the same by condemnation proceedings, claiming that it was needed for waterworks purposes, for sewerage purposes, for electric light purposes, and for street railway purposes, and that the city had the right to condemn the same for this purpose under the amendment to section 20 of the charter, which provides that "Whenever the council shall deem it necessary to take any private property for streets, roads, alleys, burying grounds, landings, wharves, sewerage, waterworks, electric light lines, gas mains or pipes, street railways, places of quarantine and buildings required for quarantine or any other public purpose, or whenever said council shall deem it necessary to acquire an easement, user, or right of way in, under and over" any private property for "any of the purposes above mentioned," it shall condemn the same according to law, if unable to purchase from the owner at a reasonable price.

Counsel for appellant contend that the city has no lawful

authority to condemn this right of way for the purposes claimed, and, as we understand it, put forward especially two propositions to support their contention. They say:

(a) That section 20 of the charter does not confer the authority, either in express words or by necessary implication; and

(b) That the spur track is not necessary to procure coal; that the same may be obtained by the Yazoo river or may be conveyed by wagons or carts from the main tracks of the Yazoo & Mississippi Valley Railroad Company to the power house.

As to the first proposition advanced by the appellant, that is, that section 20 does not confer the authority to condemn this land for the purposes named, we submit that the language of the act is as full, clear and explicit as it would be possible to express it in general terms. The legislature could not foresee and detail in the act the various specific purposes for which the city would need land and easements in the management and operation of these public utilities. It could no more do this than it could know and specify the particular site the council would select for its power house, or the routes of its sewer and water mains. It therefore delegated to the council as full and complete powers in the premises as it had itself, and couched the delegation with the broadest and most sweeping terms it could command.

When the legislature authorized the council to condemn for water works purposes, for electric light purposes, for street railway purposes, etc. (or for any other public purpose), it did so with a full knowledge of what is necessary to operate such utilities. We venture the assertion that there is not a municipality in the state engaged in a similar public service, which has not a spur track to its power house.

The case of *Canton v. Cotton Warehouse Co.*, 84 Miss. 268, 36 South. 266, does not deal directly with the law of eminent domain, but deals primarily with the construction placed by

the courts upon grants of charter powers to a corporation, but we call the court's attention to the fact that in the case just cited, the railroad company could have obtained water at a slightly reduced cost, otherwise than by laying these conduits.

In *Brown v. Gerald,* 70 L. R. A. 472, it was held that authority to an electric company to take land for the establishment of its plant includes the lands necessary for its poles and wires.

On the question of the decreased cost by exercise of eminent domain as constituting a public use or necessity, we cite from the note in 102 Am. St. Rep. 820, 821; *Burnett v. City of Boston,* 173 Mass. 173, 53 N. E. 379; *McKennon v. St. Louis, etc., R. Co.,* 69 Ark. 104, 61 S. W. 383; *Chicago, etc., R. Co. v. Pontiac,* 169 Ill. 155, 48 N. E. 485; *Chicago, etc., R. Co. v. City of Morrison,* 195 Ill. 271, 63 N. E. 96; *Richland School Township of Fulton County v. Overmyer,* 164 Ind. 382, 73 N. E. 811; *Stratford v. City of Greensboro,* 124 N. C. 127, 32 S. E. 394; *City of Dallas v. Hallock,* 44 Oregon, 246, 75 Pac. 204; *Smith v. Gould,* 59 Wis. 631, 18 N. W. 457; *City of Santa Ana v. Harlin,* 99 Cal. 538, 34 Pac. 224; *Warner v. Town of Gunnison,* 2 Colo. App. 430, 31 Pac. 238; *Knoblauch v. City of Minneapolis,* 56 Minn. 321, 57 N. W. 928; *Simpson v. City of Kansas City,* 11 Mo. 237, 20 S. W. 38; *Little Miami, etc., R. Co. v. City of Dayton,* 23 Ohio St. 510.

MAYES, J., delivered the opinion of the court.

Counsel have entered into an agreement as to the facts; therefore we deem it unnecessary to fully restate same. There is but one question in the case, in our view of it. Yazoo City is the owner of its waterworks, electric light, sewerage, and street railway systems, and in order to generate the power for operating these utilities it has a power house located not a great distance from the main track of the Yazoo & Mississippi Valley Railroad Company. In operating this plant through the power

house, it becomes necessary for the city to purchase about four thousand five hundred tons of coal per year. The city finds it cheaper to have this coal shipped via the railway than it does to have it sent by the river, and hence, in purchasing the coal, it is routed over the railway to its destination. After reaching the city it was found to cost it twenty-five cents per ton for cartage from the main line to the power plant, and in order to cut out this expense the city conceived the idea of putting in a spur track to the power house and having all cars sent over same to the power house. In order to accomplish this, it was necessary to run the spur over a lot belonging to appellant, and to use a strip of land through the lot of appellant, about one hundred and twenty-five feet in length and about twenty-five feet wide. It appears that the city constructed this spur track across this lot without the consent of appellant, and appropriated this land for this use before the appellant or the city knew the land belonged to appellant. This, however, is immaterial, as this particular feature does not affect the decision of the case. After it was discovered that this spur ran over appellant's lot, negotiations were had by both parties looking to the sale of this land to the city; but the price could not be agreed upon. Appellant offered the land to the city for $500, but the city would only offer $75. In this condition of affairs, the city failing to agree with appellant upon a price, the city undertook to condemn the land and in this way take it for the purpose of this spur track for the use already stated. The appellant enjoined the condemnation proceedings on the ground that the city had no power under its charter to condemn the land for the purpose of putting a spur track to its power house. It will be seen that the increased cost to the city of getting its coal to its power house by having it carted from the main line of railway was twenty-five cents per ton, and on the four thousand five hundred tons used by it during the year the total excess cost would be $1,125 per year. The owner of the lot offered to sell to the

city this land for $500, or $625 less than it was actually costing the city per year to haul its coal; but the city refused to pay the $500, and seeks to take the property by the exercise of eminent domain power.

The question in this case is whether, under section 20 of its charter, the city has the power to condemn this land for this purpose. Yazoo City is not under the general municipal chapter, but holds its charter by special act. The particular section involved in this case is section 20, and is as follows, viz.:

"Whenever said council shall deem it necessary to use or take and apply any private property, under the provisions of this act, for streets, roads, alleys, hospitals, burying grounds, landings, wharves, sewerage, waterworks, electric light lines, gas mains, street railways, places of quarantine and buildings required for quarantine or any other public purpose, or whenever said council shall deem it necessary to acquire an easement, user, or right of way in, under, or over any private property for the laying of water, sewer, or gas mains or pipes or any of the purposes above mentioned, they shall endeavor to purchase the said property, or the easement, user, or right of way in, under or over the same at a reasonable price, and if they cannot agree with the owner thereof or if the owner or owners be absent or incapable from legal disabilities of making a sale and conveyance of the land, or easement, user, or right of way wanted, said council may proceed to condemn said land or the use, easement, or right of way therein under and according to the procedure of the laws of the state of Mississippi in such cases made and provided," etc.

Unless it can be said that the city obtains the power to condemn this strip of land under that clause of its charter which gives it the power to condemn "places of quarantine and buildings required for quarantine *or any other public purpose,*" it is apparent by all settled rules of construction that the charter of the city confers no power to con-

demn and take this private property for the use contemplated, unless it can be said that the city may take it for the purpose of saving expense.   We shall discuss the above clause of the charter later on in this opinion in the broadest sense in which it may be claimed that it is used, but for the present we will only say that the clause only gave the city the power to condemn land for "places of quarantine and buildings required for quarantine or any other public purpose;" that is to say, when the city undertook to condemn, it could condemn for quarantine purposes, "or any other public purpose," always, of course, within the scope of the powers before specifically delegated for the use of the eminent domain powers.

This right of way is not necessary for any purpose of completing any essential feature of sewerage, or waterworks, or electric light lines, or gas mains, or street railways.   All these things can be completely accomplished in every particular without this spur track.   The sole purpose of this taking is to reduce the expense of fuel to the city by taking appellant's property for a use not needed in order to make effective its public utilities, and not named in its charter as cause for which the property might be condemned.   When we examine section 20 for power to condemn for this purpose, it is not there, either by clear expression or necessary implication, because not essential to effectuate any purpose named in the charter.   In other words, the sewerage, the waterworks, the electric light plant, the gas mains, the street railways, all may be conducted and carried on without this spur track, as well as with it. We must assume that the legislature gave the city in its charter all the power it intended it should exercise, and in so holding we are in line with the unanimous authority on this subject. Whenever a city seeks to exercise a power, it must find that power in its charter; or it must be one of necessary implication from other powers granted in order to make effective the power which the legislature has granted in express terms.

No power conferred on any corporation, either private or municipal, is to be more strictly construed than the power to exercise the right of eminent domain. Thus, in 15 Cyc. p. 567, it is said: "The power of eminent domain being in derogation of the common right, acts conferring it are to be strictly construed, and are not to be extended beyond their plain provisions. The right to exercise the power is strictly limited to the purposes specified in the statute conferring it. The proposed use of the lands of the owner must be clearly embraced within the legitimate object of the power conferred. Where there is any doubt in regard to the extent of the power, the landowner must have the benefit of that doubt." In *Binney's case,* 2 Bland. (Md.) 129, it is said: "The power to condemn private property is a portion of the eminent domain of the government, granted to this body politic, which should never be exercised by the government itself, but with great caution and in cases most obviously for the public good. When, as has been justly observed in our country, the legislature undertakes to give away what is not their own, when they attempt to take the property of one man, which he has fairly acquired, and the general law of the land protects, in order to transfer it to another, even upon a complete indemnification, it will naturally be considered as an extraordinary act of legislation, which ought to be viewed with jealous eyes, examined with critical exactness, and scrutinized with all the severity of legal exposition. An act of this sort deserves no favor. To contrue it liberally would be sinning against the rights of property. In England it has been said that all courts have, for obvious reasons, at all times, construed such legislative enactments most strictly." In Lewis on Eminent Domain, vol. 1, § 388, the same rule of construction is announced.

It is quite true that statutes granting these powers are not to be so strictly construed as to defeat the evident purpose of the legislature in granting the power; but when we hold that the

charter of Yazoo City does not carry with it the power to condemn property for the purpose of a spur track to its power house, when the only authority conferred is to exercise eminent domain proceedings in order to take private property for waterworks, electric light, gas, and street railway purposes, we certainly do no violence to the act when we say this does not include the power to take land for railroad purposes. It is certain that in so construing the act we in no way defeat the purpose of the charter power. The city may complete, operate, and maintain all these utilities without the use of this spur track in any way. See, also, *Chestatee, etc., Co. v. Cavenders Creek Company,* 119 Ga. 354, 46 S. E. 422, 100 Am. St. Rep. 174. In the case of *McElroy v. Kansas City* (C. C.) 21 Fed. 260, Justice Brewer, in speaking upon this subject says: "In these days of enormous property aggregation, where the power of eminent domain is pressed to such an extent, and when the urgency of so-called public improvements rests as a constant menace upon the sacredness of private property, no duty is more imperative than that of the strict enforcement of these constitutional provisions intended to protect every man in the possession of his own." See, also, *Ligare v. City of Chicago,* 139 Ill. 46, 28 N. E. 934, 32 Am. St. Rep. 179; *City of Waterbury v. Platt Bros. & Co.,* 75 Conn. 387, 53 Atl. 958, 60 L. R. A. 211, 96 Am. St. Rep. 229.

On a review of all the authorities there is unanimity among them to the effect that the power to exercise the right of eminent domain, whether delegated to private or municipal corporations, is limited to the express terms or clear implication of the statute authorizing its exercise, and where it is to be implied it can only be implied in a case where the implied power is indispensable to the effectuation of the purpose granted by the express terms of the statute.

As to the argument, advanced by appellee, that even if it be held that the charter power naming specific things for which

private property may be condemned is not broad enough to cover the use sought here, yet the use intended is "a public use," and a general provision in the charter authorizes the taking not only for the specific things enumerated, but provides that private property may not only be condemned for those uses, but for "any other public purposes," we cannot agree that this contention is a sound one. It is quite true that the charter names certain things for which private property may be condemned, and then concludes with the sweeping clause of "any other public purpose," thus seemingly delegating to the municipality a power of eminent domain as broad as that possessed by the state. This clause can only mean that the powers conferred specifically shall be broad enough to accomplish this specific purpose. It is limited in its operation to the effectuation of the specific subjects named in the charter and adds no new and independent rights. *State v. City of Newark,* 54 N. J. Law, 62, 23 Atl. 129.

Eminent domain rights are attributes of sovereignty, to be exercised by the state with great caution and only in cases of public necessity. It is a power which sleeps in the bosom of the state until aroused into activity by an act of the legislature. This high power is never to be presumed to be confided to any public or private body or corporation, however great may be the necessity for it to have and exercise such power. When it is asserted by any person or corporation, the state's assent must be clearly given in legislative acts, and the subjects for which it may be exercised specifically named. No state has yet given to any corporation the sweeping power to condemn and take private property for "any public purpose," without preceding every such clause with specifically named subjects for which it may exercise the right. Even if it can be done, we do not believe any state will ever confide this sovereign power, so liable to abuse and filled with possibility of oppression, by a clause so sweeping as to vest any individual or corporation with the

power to condemn at pleasure for any and every public use, without specifically naming the public use.

The court below having sustained the contention of the city and dissolved the injunction, the injunction is hereby reinstated, the decree reversed and cause remanded.

*Reversed.*

WHITFIELD, C. J., delivered the following dissenting opinion:

I desire to state very briefly the ground of my dissent in this case. Section 20 of the charter provides: "Whenever said council shall deem it necessary to use or take and apply any private property, for streets, roads, alleys, hospitals, burying grounds, landings, wharves, sewerage, waterworks, electric light lines, gas mains, street railways, places of quarantine and buildings required for quarantine or any other public purpose," etc., "they may proceed to condemn said land," etc., "under eminent domain proceedings." The same section further provides: "Whenever said council shall deem it necessary to acquire an easement, or right of way in, under, or over any private property for the laying of water, sewer or gas mains or pipes or any of the purposes above mentioned," it shall likewise proceed to exercise the right of eminent domain, if an agreement cannot be had with the owner. It is agreed that no agreement could be reached between the city and the owner as to the purchase of the right of way. The city was proceeding under said section 20 to condemn a right of way over this strip of land, when an injunction was sued out against the city to stop the proceeding. The city made a motion to dissolve this injunction, which motion was sustained, and the injunction dissolved, and from that decree appellant appeals.

The whole controversy comes to this single inquiry: Did the city have the power to condemn this right of way as necessary means to effectuate the public purpose, the transportation of

this coal over this spur track, to enable the city to conduct its furnaces in the safest, quickest, and most reasonable, practical way? I agree, of course, with the general announcement of the opinion in chief as to the rule of strict construction of statutes or charters granting the right of eminent domain. But this clause, "any other public purpose" must receive a common-sense construction, keeping in view the whole situation. It should not receive a construction so narrow and so technical as to defeat the manifest purpose of the grant. In the development of a city, from decade to decade, as it advances in the scale of civilization, what might be thought a public purpose as to a great city might very well not be regarded as a public purpose for a mere village. Nay, more, what might be considered a public purpose for a city at one period of its development might not be a public purpose at some earlier stage of development. The size of a city, its population, its relation to commerce, its use of railroads, telephones, telegraphs, and all the public utilities known now to modern life, as well as the revenues of the city, should be taken into consideration in construing the grant in this day, as to whether a certain purpose is a public purpose or not, and whether the taking, consequently, of private property in the exercise of the right of eminent domain is a taking for public use or private use. See my dissent in *Jackson v. Williams,* 92 Miss. 324, 46 South. 551. It seems to me to be too clear for controversy that the use here to which this spur was to be dedicated was a public use, and not a private use; and it seems equally plain to me that this charter did confer the power to condemn this right of way for this public use by the words quoted above from section 20 of the charter. I cannot conceive how language could be broader than the phrase "any other public purpose;" and when, in addition to that, it is said, "but whenever the city council shall deem it necessary to acquire a right of way over any private property" for any of the purposes above mentioned, it is impossible for me to resist

the conclusion that this charter does give,. in plain and express language, the power to Yazoo City to condemn this right of way for this spur track.

It was, of course, impossible for the legislature to foresee, when they granted this special charter, all the public purposes for which it might become necessary, from decade to decade, for Yazoo City, as it developed, to exercise the right of eminent domain. The grant ought, therefore, to receive a broad and reasonable interpretation in view of this fact, so that the city might not be unreasonably hampered in building itself up along modern lines into the great city it aspires to be. It seems to be conceded by counsel for appellant that under this charter the city had power to condemn for a power house; and how, if this be true, it has not also the necessarily associated power to condemn a strip of land for a spur track over which to transport the coal to the power house I confess myself unable to see. The charter expressly provides that the city may own these modern utilities, waterworks, electric lights, street railways, etc., for the benefit of the inhabitants, and that the city may, of course, condemn private property, or easements in private property, for the construction, etc., of these public utilities, whenever said council shall deem it necessary, and it adds that it may so condemn private property "for any other public purpose." Under this charter, manifestly, the city had the power to determine what lands, what easements, and rights of way were necessary to the complete acquisition and proper and efficient operation of these public utilities; and any act of the council reasonably calculated to promote the success of any of these enterprises, necessarily incidental to the business of operating any of them, surely ought to be held to be clearly embraced in these general terms.

I think the language of Chief Justice WOODS, speaking for this court in *Ewing v. Railroad,* 68 Miss. 551, 9 South. 295,

fits in here with marvelous aptness. He said: "But that is not a strict construction which denies to the agency created the very means which are indispensable to the accomplishment of the ends of its creation. That is the destruction of the agency, and not a construction of the grant of the powers conferred." That was a case where the railroad company had the power to condemn for a "railroad;" but the court held that under that grant it also had power, as necessarily incidental to the main grant, to condemn for side tracks, station houses, turntables, fuel storage, water tanks, and repair shops; the court adding: "True, the public uses only the main line of a railway, and all the adjuncts just named are used solely by the railroad company, and yet these are as necessary to the attainment of the public good as the main line itself." The right to own and operate a power house necessarily and inescapably presupposes the right to operate it with such fuel as is right to operate it with, and also presupposes the right to obtain the same in such reasonable and ordinary manner as the council shall deem wise and to the best interests of the public. The operation of the power house without coal is unthinkable. The mere method of obtaining it is in the reasonable discretion of the council. In the case of *Canton v. Cotton Warehouse Co.*, 48 Miss. 268, 36 South. 266, 105 Am. St. Rep. 428, 65 L. R. A. 561, where the right to lay water pipes in the right of way of the railroad across the public streets of Canton to conduct water from an ice plant to the tanks of the railroad company was involved, and in upholding that right the court said: "The broad fundamental principle is: In the construction or maintenance of its line of road, a railroad company is vested with all such power as may be requisite for the successful consummation of the object for which it was granted corporate existence." See, also, specially, the case of *In re Minneapolis & St. L. R. Co. v. Nicolin*, 76 Minn. 302, 79 N. W. 304. See, also,

*Chicago Ry. Co. v. Morehouse,* 112 Wis. 1, 87 N. W. 849, 56 L. R. A. 240, 88 Am. St. Rep. 918, and *Zircle v. Southern Ry. Co.,* 102 Va. 17, 45 S. E. 802, 102 Am. St. Rep. 805.

I will not protract further this opinion. I conclude that, first, the charter grants, in the most explicit and express terms, the power to condemn this land for this spur track; second, the use of the right of way for the purposes indicated is a public and not a private use; and, consequently, that the decree should be affirmed.

*Affirmed.*